**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RILEY J. WILSON,** | ) | |
| **on behalf of himself and all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 5453** |
| | ) | |
| **CAREER EDUCATION** | ) | |
| **CORPORATION,** | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court is the motion of defendant Career Education Corporation ("CEC") to dismiss plaintiff Riley J. Wilson's ("Wilson") complaint. [Dkt 18.] Oral argument was held on the motion on March 6, 2012, and the court accepted supplemental briefing from the parties thereafter. [Dkt 37, 38, 39.] Wilson alleges that CEC failed to pay bonuses to him and other similarly situated employees under a supplemental compensation plan it instituted. CEC argues that the plain language of the plan permitted CEC unilaterally to terminate or amend it for any reason and in its sole discretion, and that Wilson was not entitled to any compensation after CEC chose to exercise that option. Because the terms of the plan unambiguously provided CEC the right to terminate it at any time, and because Wilson cannot maintain a claim for quasi-contract relief in the alternative, the motion is granted.

1

## BACKGROUND

Wilson brought this putative class action suit alleging that CEC failed to pay him and all other similarly situated employees certain bonuses he alleges they earned. CEC operates about 11 for-profit postsecondary schools variously located in about 25 states. (Compl. ¶ 3.) [Dkt 1.] Wilson worked for CEC from about October 6, 2008 through May 18, 2011 at Le Cordon Bleu culinary arts college, located in Mendota Heights, Minnesota. (Compl. ¶¶ 2, 6, 17.) He began as a high school admissions representative, and sometime in 2010 became an inside sales admissions representative. (*Id.* ¶¶ 6, 14.) In both positions, his job involved recruiting high school students to attend Le Cordon Bleu. (*Id.* ¶¶ 6, 7, 12-14.)

As an admissions representative, Wilson participated in the Admissions Representative Supplemental Compensation Plan ("ARSC Plan" or "Plan"). (*Id.* ¶¶ 7, 9.) The ARSC Plan provided that admissions representatives who exceeded minimum quarterly thresholds (known as "Minimum Performance Goals") of students they enrolled in a CEC school became "eligible" to receive a bonus of $400 for each additional student over the minimum number when those students met certain conditions. (Compl. ¶ 10; Def.'s Mot., Decl. Jackie Barry, Ex. B at 1, 4 ("Plan").)[1] Those conditions included (but were not limited to) the following: (1) the student successfully completed either his or her academic program or one academic year of the program, whichever is shorter; (2) the student attained one of these benchmarks within a nine-month "Evaluation Period" (which began six months after the end of the quarter during which the student started attending the school and ended fifteen

---

[1] Wilson did not attach a copy of the ARSC Plan to his complaint. CEC has submitted a document entitled "Supplemental Compensation Plan for Admissions Representatives" for the calendar year 2010, which states it is effective "for the 2010 calendar year only." (Plan at 1). Wilson agrees this was the operative document at issue during that time period. (Pl.'s Resp. at 4.)

months after the student started attending the school); and (3) the student attained one of those benchmarks prior to the resignation or termination of the admissions representative. (Compl. ¶ 10; Plan at 1, 2, 4.)

The Plan specifically provided the following language as to when bonuses were "earned":

> The admissions representative will earn supplemental compensation of $400 for each such student beyond the thresholds specified in the representative's Minimum Performance Goals for number of graduates or number of students who complete one academic year of their program ("MPG Threshold"). The earned supplemental compensation will be paid on a monthly basis, after the end of each month during the evaluation period, unless otherwise required to paid sooner under applicable law.
>
> . . .
>
> An employee is considered to have "earned" supplemental compensation under this Plan for the evaluation period during which his/her employment ends if, as of the employee's termination date, the employee has exceeded his/her MPG Threshold for that evaluation period for students who have successfully completed either their academic program or one academic year of their program. The employee will only be entitled to supplemental compensation under this Plan based on those students who have successfully completed their academic program or one academic year of their program, whichever is shorter, as of the employee's termination date, and not for any students who successfully complete their academic program or one academic year of their program after the employee's termination date.

(Plan at 1, 2.) Given these requirements, bonuses were not earned until a number of months after the quarter in which the student initially enrolled.

The ARSC Plan also contains the following clause:

> If CEC determines at any time that this Plan should be modified due to the requirements or standards of the U.S. Department of Education or any state agency or accrediting commission, then CEC may be obligated to modify this Plan. *CEC reserves the right to terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or for any other reason that CEC determines, in its sole discretion. Any interpretation of any provision of this Plan or of any regulatory authority may be made by CEC in its sole discretion.*

(Plan at 3 (emphasis added).)

3

In a memo to its admissions representatives and advisors dated December 9, 2010, CEC announced it was ending the ARSC Plan pursuant to a federal regulation from the U.S. Department of Education that would become effective in 2011. (Compl. ¶¶ 19, 20; Def.'s Mot., Barry Decl., Ex. C.) CEC announced it would pay bonuses under the Plan as they came due through February 28, 2011, but not thereafter. (*Id.*) Although not stated in the notice, Wilson asserts the regulation at issue became effective on July 1, 2011. (Compl. ¶ 20.) Wilson does not dispute the validity of the regulation or that it would prohibit CEC from paying bonuses under the ARSC Plan as of July 2011. (Compl. ¶¶ 34-36; Pl.'s Resp. at 4 [dkt 23].) Rather, Wilson's position is that the regulation did not require CEC to terminate bonus payments that were "in the pipeline" before December 9, 2010 but that would have come due sometime between March 1 and June 30, 2011 if the students met all the applicable criteria. Wilson resigned from CEC on May 18, 2011. (Compl. ¶¶ 16, 20, 34.)

Wilson brings a two-count complaint alleging: (1) breach of contract and (2) implied contract and unjust enrichment, individually and on behalf of a class of CEC admissions representatives operating under the same or similar plans. Wilson asserts that he is entitled to a total of approximately $9,200 in unpaid bonuses under the Plan for the time period of March through May 2011. (Compl. ¶¶ 34, 35.) This total represents 23 students that Wilson enrolled while the Plan was in effect but who did not meet the other conditions until March, April, or May 2011. (*Id.*)[2] Wilson estimates similar damages to the proposed class in this time period would total in excess of $5 million. (*Id.* ¶ 37.)

---

[2] Wilson also alleges that as of the last day of his employment, May 18, 2011, he was owed $8,400 for 21 students who had qualified as of that date. (Compl. ¶ 17.)

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950. As the Seventh Circuit has stated:

> A complaint will withstand a motion to dismiss [under Rule 12(b)(6)] if it provides a short and plain statement of the claim showing that the pleader is entitled to relief that is also sufficient to provide the defendant with fair notice of the claim and its basis. In order to demonstrate that he is entitled to relief, however, the pleader must show through his allegations that it is plausible, rather than merely speculative, that he is entitled to relief.

*INEOS Polymers, Inc. v. BASF Catalysts*, 553 F.3d 491, 497 (7th Cir. 2009) (citations and quotations omitted).

In ruling on a motion dismiss, the court may also consider documents, such as contracts, that are referenced in the complaint, so long as they are concededly authentic and central to the plaintiff's claims. *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). "The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given to the material." *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 662 (7th Cir. 2002) (quoting Charles Alan Wright et al., *Federal Practice and Procedure: Civil 2d* vol. 5 § 1327 at 766). However, if documents further "outside the pleadings" are considered by the court, the motion must be treated as one for summary judgment. Fed. R. Civ. P. 12(d).

5

Here, Wilson did not attach any exhibits to his complaint, but CEC has submitted relevant portions of the ARSC Plan as well as the December 9, 2010 memo, both of which were discussed in the complaint. (Def.'s Mot., Barry Decl., Ex. B, C.)  Wilson impliedly conceded the authenticity of these documents by citing them in his response.  (Pl.'s Resp. at 2-4.)  The court will therefore consider both of those documents along with all of Wilson's well-pleaded factual allegations in resolving the motion.

## DISCUSSION

### I.      Jurisdiction.

As a preliminary matter, the court addresses the issue of its subject matter jurisdiction over this case.  The court has an independent obligation to ensure its jurisdiction is secure, whether or not the issue is raised by the parties.  *Carroll v. Stryker Corp.*, 658 F.3d 675, 680 (7th Cir. 2011).  A federal court has diversity jurisdiction over all civil actions between citizens of different states so long as the matter in controversy exceeds $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a).  Federal diversity jurisdiction also exists when the matter in controversy exceeds $5 million and is a "class action" in which any member of the class is a citizen of a state different from any defendant.  28 U.S.C. § 1332(d)(2).  A "class action" is defined as one "filed under rule 23 of the Federal Rules of Civil Procedure."  28 U.S.C. § 1332(d)(1)(B).

Wilson is a citizen of Minnesota and CEC is a Delaware corporation with its principal executive offices in Schaumburg, Illinois; therefore, the diversity of citizenship requirement is met.

(Compl. ¶¶ 2, 3.)[3]  Wilson brought this case as a putative class action and filed a motion to certify a class, which was stayed pending the outcome of the present motion.  [Dkt 29, 34.]  While Wilson's complaint pleads damages estimated at over $5 million for the putative class, he individually alleges damages of only $9,200.  (Compl. ¶¶ 35, 37.)  Thus, whether the court has jurisdiction depends on whether the existence of a proper class is a prerequisite to subject matter jurisdiction under § 1332(d)(2).  That is, does the court have the jurisdiction to make a substantive ruling (as here on a motion to dismiss) before it has determined that a class may be certified under Rule 23?

The Seventh Circuit recently answered that question by holding that jurisdiction under § 1332(d)(2) does not depend upon certification because "jurisdiction attaches when a suit is *filed* as a class action, and that invariably precedes certification. . . .  That needn't imply that unless the class is certified the court loses jurisdiction of the case." *Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806 (7th Cir. 2010).  Therefore, it is sufficient that Wilson filed this case as a class action with damages allegedly exceeding $5 million, and federal jurisdiction is secure.[4]  The parties consented to magistrate judge jurisdiction.  [Dkt 25.]

## II.    Choice of Law.

The Plan does not contain a choice-of-law provision, and the parties dispute what law should

---

[3]  Wilson actually pled that he is a "resident of Minnesota."  (Compl. ¶ 4.)  "Domicile," not residency, is the standard for citizenship. *Heinen v. Northrop Grumman Corp.*, 671 F.3d 669, 670 (7th Cir. 2012).  Domicile is "the state in which a person intends to live over the long run." *Id.* (citations omitted).  From the allegations of the complaint that Wilson resides in, and worked for CEC in, Minnesota, the court concludes that he is domiciled in that state.  CEC does not contest those allegations.

[4]  Although the complaint was filed as a putative class action, because a class has not yet been certified, only Wilson's individual claims are addressed here.

apply.  CEC argues that Minnesota law should govern, while Wilson argues for Illinois law.  (Def.'s Mot. at 5-6; Pl.'s Resp. at 6-8).  However, both parties also agree that under either state's law, the standards are substantively similar and the outcome of the motion would ultimately be the same. (Def.'s Mot. at 8 n. 3; Pl.'s Resp. at 7; Def.'s Reply at 9-11 [dkt 24].)

Generally speaking, in a case over which a court has diversity jurisdiction, it applies the forum state's choice-of-law rules to determine which state's substantive law should govern. *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004).  For a court sitting in Illinois, that would mean applying the "most significant contacts" test. *Id.*  However, such a determination is unnecessary when the outcome under either state's law would be the same.  "[B]efore entangling itself in messy issues of conflict of laws[,] a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992).  Where the parties have not identified a conflict, the court generally applies the law of the forum state. *See Kochert v. Adagen Medical Intl., Inc.*, 491 F.3d 674, 677 (7th Cir. 2007). As the following analysis demonstrates, the result would be the same under either Illinois or Minnesota law.  Therefore, the court need not reach the choice-of-law issue for the purposes of deciding this motion.

**III.    Wilson cannot maintain a claim for express breach of contract (Count I).**

Under either Illinois or Minnesota law, the elements required to establish a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) a resulting injury to the plaintiff. *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001) (citing *Hickox v. Bell*, 552 N.E.2d 1133, 1143

(Ill. App. 5th Dist. 1990)); *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000). For the purposes of this part of the motion, the court will assume that the Plan constituted a valid contract.[5] However, Wilson's claim must still be dismissed because the facts pled do not establish that CEC breached the contract.

The primary goal of contract interpretation is to determine and enforce the intent of the parties. *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011); *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003). Where an unambiguous document plainly sets out the parties' intent, it governs the interpretation. *Thompson*, 948 N.E.2d at 47, *Motorsports Racing Plus*, 666 N.W.2d at 323. On the other hand, if an ambiguity exists within the four corners of the contract, it may need to be resolved through the introduction of extrinsic evidence. *Thompson*, 948 N.E.2d at 47; *Blackburn, Nickels & Smith, Inc. v. Erickson*, 366 N.W.2d 640, 643 (Minn. App. 1985). The question of ambiguity is one of law, but resolution of the parties' intent by reference to extrinsic evidence is one for the finder of fact. *Blackburn, Nickels & Smith*, 366 N.W.2d at 643.

---

[5] CEC argues that the Plan is not an enforceable contract because the reservation of discretion to terminate it at any time meant that any promise of a bonus was "illusory," *i.e.*, unenforceable. (Def.'s Mot. at 8; Def.'s Suppl. Br. at 1-3 [dkt 39].) In some instances, courts have held that an employee bonus plan that gives the employer the unilateral right to modify or terminate it at any time and for any reason is not an enforceable contract. *See Tatom v. Ameritech Corp.*, 305 F.3d 737, 742-44 (7th Cir. 2002); *Rudolph v. Intl. Bus. Mach. Corp.*, No. 09 C 428, 2009 WL 2632195 at *3-4 (N.D. Ill. Aug. 21, 2009) (collecting cases); *Grenier v. Air Express Intl. Corp.,* 132 F. Supp. 2d 1198, 1201-02 (D. Minn. 2001) (collecting cases); *Brozo v. Oracle Corp.*, 324 F.3d 661 (8th Cir. 2003). A compensation plan must contain a clear promise of a bonus to be enforceable, and this does not happen when the employer reserves the right to cancel the entire program at any time. *Hegel v. Brunswick Corp.*, No. 09 C 882, 2011 WL 1103825 at *6 (E.D. Wis. Mar. 23, 2011); *Rakos v. Skytel Corp.*, 954 F. Supp. 1234, 1238 (N.D. Ill. 1996).

Wilson addresses some of these cases and argues they are distinguishable on the facts because the bonus plans there either expressly granted the employer the right terminate them retroactively or were discretionary as to the amount of the bonus. (Pl.'s Suppl. Br. at 3-4.) [Dkt 38.] In any event, it is unnecessary to decide that issue here, because Wilson has not established the breach element and thus cannot maintain his express breach of contract claim on that basis.

To determine whether the terms of a contract are ambiguous, the court must ascertain whether it is reasonably susceptible to more than one interpretation. *Thompson*, 948 N.E.2d at 47; *Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 148 (Minn. 2002); *Blackburn*, 366 N.W.2d at 643. The court considers the plain words of the contract taken in the context of the document as a whole, giving effect to all provisions. *Thompson*, 948 N.E.2d at 47; *Motorsports Racing Plus*, 666 N.W.2d at 323-24. The fact that the parties disagree about the terms of the contract in hindsight, or that it does not expressly address a certain point, does not automatically render it ambiguous. *Knudsen v. Transport Leasing/Contract, Inc.*, 672 N.W.2d 221, 223 (Minn. App. 2003); *Fleet Bus. Credit, LLC v. Enterasys Networks, Inc.*, 816 N.E.2d 619, 629 (Ill. App. 1st Dist. 2004).

Wilson argues that the termination clause "is silent on retroactivity," and so it unambiguously allows CEC to terminate the Plan only "prospectively." (Pl.'s Resp. at 9.) By this, he means that CEC was obligated to pay bonuses for students who the admissions representatives had enrolled but who had not met all of the other Plan criteria at the time it was terminated, and who later went on to meet those criteria. (*Id*. at 8-9.) Alternatively, Wilson argues that the clause is ambiguous because it does not expressly say whether it will apply to these "in the pipeline" students, and extrinsic evidence is necessary to interpret the Plan. (*Id*. at 9-10.) CEC, on the other hand, argues the clause unambiguously allowed it to end any bonus payments which employees had not yet earned (because the students had not met all the conditions) at the point it chose to terminate the Plan in December 2010, although it voluntarily continued to pay bonuses through February 2011. (Def.'s Mot. at 7-8; Def.'s Reply at 2-4.)

The termination clause at issue in the Plan is unambiguous. It is true that the termination clause does not expressly state that it will apply to what Wilson calls "in the pipeline payments."

10

However, when read with the Plan as a whole, it is clear that interpreting the termination clause as CEC did is consistent with the other Plan terms.  Wilson does not dispute that CEC reserved the unilateral right to terminate the Plan at any time and for any reason.  The exercise of that right would necessarily cut off eligibility for bonus payments that had not yet been earned at the time of termination.  That includes bonuses for enrolling students in a CEC school who had not yet met the other conditions of the Plan.  Despite Wilson's characterization that the termination applied "retroactively" to those students, it was not, in fact, retroactive because under the Plan's terms, Wilson had not yet earned those bonuses.  As CEC observes, "Wilson does not allege that CEC failed to pay bonuses for students who successfully completed their academic programs during evaluation periods before CEC terminated the Plan.  Rather, he has alleged only that he was not paid for bonuses he *might have earned* between February 28, 2011 and June 30, 2011 had the Plan not been discontinued."  (Def.'s Suppl. Br. at 3 (emphasis in original, footnote omitted).)

At any point that CEC exercised its right to terminate the Plan, there were likely to be some students already enrolled who might have later earned an admissions representative a bonus if the Plan was still in place at that time.  But the terms of the Plan are clear that CEC could terminate it at any time and for any reason, and it cannot be read to require ongoing payments after termination occurred and the Plan was no longer in effect.  Although Wilson argues that his work was done when a student enrolled (Pl.'s Suppl. Br. at 2), all the conditions necessary to entitle him to a bonus were not satisfied until the student met all the criteria set forth in the Plan.  Thus, under the facts Wilson has pled, he cannot state a claim for breach of contract.[6]

---

[6] In his supplemental brief, Wilson cites *Quiello v. Reward Network Estab. Servs., Inc.*, 420 F. Supp. 2d 23 (D. Conn. 2006) to illustrate the "fallacy of retroactive termination."  (Pl.'s Suppl. Br. at 2-3.)  However, Wilson's reliance on that case is misplaced.  In *Quiello*, the court held that

For the first time in his responsive brief to CEC's motion, Wilson takes the position that CEC violated an implied duty of good faith and fair dealing in terminating the Plan in the manner it which it did. (Pl.'s Resp. at 11-14.) Wilson asserts that CEC's actions "arbitrarily declared it would no longer make the promised payments . . . in effect stopping the game (which it had started) while there was still time on the clock." (*Id.* at 13.) Under Illinois law, an implied duty of good faith and fair dealing is read into every contract. *Tatom*, 305 F.3d at 745. When one party to a contract is vested with discretion, "it must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously or in a manner inconsistent with the reasonable expectations of the parties." *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 884 (7th Cir. 2000).

Minnesota law does not read this implied duty into every employment contract. *See Brozo*, 324 F.3d at 667 (applying Minnesota law); *Hunt v. IBM Mid America Employees Fed. Credit Union*, 384 N.W.2d 853, 858 (Minn. 1986) (declining to apply this duty in employment contracts). Whether Minnesota courts would read a duty of good faith into a bonus plan like the one here is not entirely clear, but ultimately it is a moot point for the purposes of deciding this motion.

The facts set forth in Wilson's complaint do not support a claim that CEC did not act in good

---

the employer could not impose a new commission rate on sales generated by a program that the plaintiff had previously put into place with the promise of a different commission rate. *Quiello*, 420 F. Supp. 2d at 33. However, the court explicitly noted that it was entitlement to the commission *rate*, but not the actual commission itself, that vested at the time the employee put the program into place. *Id.* It was undisputed that the commission itself was not actually earned until a sale was made under the program. *Id.* at 31. The rationale in *Quiello* might apply to this case if CEC had changed the bonus rate from $400 to some other figure for students Wilson had already enrolled. But that would only become an issue at the point Wilson actually earned the bonus for those students. Because CEC's termination of the Plan only applied to as yet unearned bonuses, it was not a "retroactive" action at all.

faith. Wilson admits that CEC's termination of the Plan was triggered by a federal regulation prohibiting such bonuses. Wilson's only complaint is that CEC terminated it earlier than required. However, in doing so, CEC took an action expressly authorized by the Plan. In fact, CEC voluntarily offered a "grace period" of sorts in which it continued to pay bonuses for three months after the Plan termination was announced. Wilson's argument that the decision was not made in good faith because the admissions representatives had already begun performance is also inconsistent with the terms of the Plan, which provide that a bonus is not yet earned at that point.

For the foregoing reasons, Count I of Wilson's complaint must be dismissed for failure to state a claim.


## IV. Wilson cannot maintain a claim for a quasi-contract remedy (Count II).

Wilson alternatively pleads a count for implied contract and unjust enrichment, stating that the Plan gave rise to an implied contract and that CEC was unjustly enriched by withholding bonus payments for work Wilson had already performed. Generally, a claim for unjust enrichment arises when the plaintiff has conferred a benefit on the defendant which the defendant accepts, and retention of the benefit by the defendant without payment to the plaintiff would violate fundamental principles of justice, equity, and good conscience. *See Bd. of Mgrs. of Hidden Lake Townhome Owners Assoc. v. Green Trails Improvement Assoc.*, 934 N.E.2d 636, 644 (Ill. App. 2d Dist. 2010); *ServiceMaster of St. Cloud v. GAB Business Servs., Inc.,* 544 N.W.2d 302, 306 (Minn. 1996)*; Acton Constr. Co. v. State*, 383 N.W.2d 416, 417 (Minn. App. 1986) (stating that elements of quasi-contract are "a benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under such

circumstances that it would be inequitable for him to retain it without paying the value thereof"). An unjust enrichment action allows a court to impose a quasi-contract in the absence of an express agreement to prevent a party from unjustly benefitting at the expense of another. *See id.; Village of Bloomingdale v. CDG Enters., Inc.,* 752 N.E.2d 1090, 1101-02 (Ill. 2001). Damages in an unjust enrichment claim are measured by the defendant's gain, not the plaintiff's loss. *Bd. of Mgrs.,* 934 N.E.2d at 644.

Wilson cannot maintain a claim for unjust enrichment if the agreement between the parties is laid out in an enforceable written contract. Unjust enrichment is based on an implied contract, and the theory does not apply where there is an express contract that governs the relationship of the parties. *Id.; M.M. Silta, Inc. v. Cleveland Cliffs, Inc.,* 616 F.3d 872, 880 (8th Cir. 2010) (applying Minnesota law). A party to a contract cannot use an equitable doctrine to set aside the unambiguous terms of the parties' agreement.

Wilson's unjust enrichment claim appears to gain some traction from CEC's argument that the Plan is not an enforceable contract because the reservation of discretion to terminate it rendered any promise of additional compensation an illusory one. (*See* n. 5, *supra.*) But even assuming, *arguendo*, that the Plan is not an enforceable contract, Wilson does not establish a quasi-contract claim because CEC did not unjustly benefit at Wilson's expense. CEC was not *unjustly* enriched by work Wilson performed but for which he never received a bonus if the Plan did not guarantee him a bonus in the first place. *See Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 855 (8th Cir. 2003) (holding an employer was not "enriched" by benefits to which an employee was not, as a matter of law, entitled). Wilson's expectation of a bonus was based only on the Plan, which could be terminated in CEC's sole discretion. It cannot then be said that CEC was unjustly enriched by

14

doing so.

Furthermore, an employer is "well within its rights to retain the benefit of employees' services for which the company paid a regular salary," and it is not inequitable to do so even if the employees "worked extra hard" because the potential for a bonus existed. *Hegel*, 2011 WL 1103825 at *9. Recruiting students was part of Wilson's job description for which he received a salary, with or without the potential for a bonus. The supplemental compensation contemplated by the Plan was an incentive to motivate employees like Wilson to recruit more students. That Wilson may have recruited additional students because the potential for a bonus existed in the future does not mean that CEC's conduct in exercising its right to end that bonus plan was inequitable. Therefore, Count II of Wilson's complaint must be dismissed.

## CONCLUSION

For the foregoing reasons, Wilson's complaint is dismissed for failure to state a claim. It does not appear that there is any amended complaint Wilson could file to state a valid claim. However, he is given until May 10, 2012 to move for leave to file an amended complaint. If he does not file such a motion by that date, the case will be dismissed with prejudice.

**IT IS SO ORDERED.**

_Geraldine Soat Brown_
_____
GERALDINE SOAT BROWN
United States Magistrate Judge

DATED: April 12, 2012