**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RILEY J. WILSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 11 C 5453** |
| | ) | |
| **v.** | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| **CAREER EDUCATION CORPORATION,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court is Defendant's Motion for Summary Judgment. (Def.'s Mot.) [Dkt 79.] For the reasons set forth below, Defendant's motion is granted.

## PROCEDURAL HISTORY

Plaintiff Riley Wilson filed this case as a class action against his former employer, defendant Career Education Corporation ("CEC"), alleging that CEC had breached his employment contract and that of other admissions representatives by depriving them of bonuses that they should have received. (Compl. ¶ 1.) [Dkt 1.] Wilson also alleged claims under implied contract and unjust enrichment theories of liability. (Compl. ¶¶ 39-45.) Wilson's complaint was dismissed for failure to state a claim. [Dkt 41.]; *Wilson v. Career Educ. Corp.*, No. 11 C 5453, 2012 WL 1246328 at *4 (N.D. Ill. Apr. 13, 2012) (reversed and remanded on other grounds). Wilson appealed, and the majority of the Seventh Circuit panel concluded in a *per curiam* decision that there was an enforceable contract, that CEC had the unambiguous right to terminate the plan and refuse to pay bonuses, and that an enforceable contract precluded recovery on an unjust enrichment theory. *Wilson*

*v. Career Educ. Corp.*, 729 F.3d 665, 671 (7th Cir. 2013). However, a majority also concluded that Wilson successfully pleaded a claim for violation of the implied covenant of good faith and fair dealing, and remanded the case for further proceedings on that theory. *Id.*

Discovery has now been completed on the issue of liability.[1] CEC moved for summary judgment and filed a memorandum in support of its motion. (Def.'s Mem.) [Dkt 80.] Wilson filed a response in opposition to CEC's motion (Pl.'s Resp.) [dkt 89], and CEC replied (Def.'s Reply) [dkt 96].

**JURISDICTION**

Wilson invokes federal jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because he brings this case as a class action and alleges that damages exceed five million dollars and that at least one member of the class is diverse from CEC. (Compl. ¶ 4.) Wilson is a citizen of Minnesota; CEC is incorporated in Delaware and has its principal place of business in Illinois. *Wilson*, 2012 WL 1246328 at *4. Although a class has not yet been certified, there is jurisdiction because "jurisdiction attaches when a suit is *filed* as a class action, and that invariably precedes certification." *Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806 (7th Cir. 2010) (emphasis in original)). The parties agree that jurisdiction and venue are proper. (Pl.'s LR Resp. ¶ 1.) [Dkt 91.][2]

[1] The parties agreed to complete discovery regarding liability and reserve discovery regarding class certification until disposition of CEC's motion for summary judgment. (Order, Feb. 19, 2014.) [Dkt 70.]

[2] The facts are taken from the parties' statements made in accordance with Local Rule 56.1: CEC's Statement of Undisputed Material Facts (Def.'s LR Stmt) [dkt 81], and Wilson's Response to CEC's Statement of Undisputed Material Facts (Pl.'s LR Resp.) [dkt 91]. Additional facts are taken from Wilson's Statement of Additional Facts Pursuant to Rule 56.1(B) (Pl.'s Add'l Facts) [dkt 90], as well as CEC's Response to Wilson's Statement of Additional

## FACTS

The relevant facts are largely undisputed. Wilson was an admissions representative for a wholly-owned subsidiary of CEC from October 6, 2008 until his voluntary resignation on May 18, 2011. (Pl.'s LR Resp. ¶ 2.) CEC is a for-profit entity that offers education services in a variety of contexts. (*Id.* ¶¶ 3-4.) As of the end of 2010, CEC employed 2,123 admissions representatives. (Answer to Compl. ¶ 22.) [Dkt 69.] In 2009, 2010, and 2011, CEC generated revenues of approximately $1.83 billion, $2.12 billion, and $1.88 billion, respectively, against operating expenses of approximately $1.61 billion, $1.88 billion, and $1.85 billion, respectively. (Pl.'s LR Resp. ¶ 4.)

Starting in 2007, CEC implemented a bonus incentive program for admissions representatives (the "ARSC Plan" or the "Plan") that complied with the Higher Education Act ("HEA"). (*Id.* ¶ 12.) Wilson was informed before he was hired that there was an incentive compensation plan, and he learned more about the details of the Plan after he was hired. (Def.'s Add'l Facts Resp. ¶¶ 1-2.)

The relevant terms of the Plan were set out in the Seventh Circuit's opinion. *See Wilson*, 729 F. 3d at 669-70. Several conditions had to be met for an admissions representative to receive supplemental compensation under the Plan: (1) the admissions representative had to enroll students in excess of a specified number; (2) the students had to successfully complete their academic program or one year of their program; (3) the student completion requirements had to occur during a specified period of time; and (4) the admissions representative had to be an active employee when the requirements were met. (Pl.'s LR Resp. ¶ 13.) The ARSC Plan also provided:

---

Facts Pursuant to Rule 56.1(B) (Def.'s Add'l Facts Resp.) [dkt 97].

> If CEC determines at any time that this Plan should be modified due to the requirements or standards of the U.S. Department of Education or any state agency or accrediting commission, then CEC may be obligated to modify this Plan. CEC reserves the right to terminate or amend the terms of this Plan at any time, for regulatory compliance purposes or for any other reason that CEC determines, in its sole discretion. Any interpretation of any provision of this Plan or of any regulatory authority may be made by CEC in its sole discretion.

(Def.'s LR Stmt., Ex. 18 at 3.) The version of the Plan relevant to this case was "effective as of January 1, 2010 for the 2010 calendar year only." (Pl.'s LR Resp. ¶ 12; Def.'s LR Stmt., Ex. 18 at 1.) The parties agree, however, that it was possible that payments under the 2010 ARSC Plan would be made in 2011 to admissions representatives who were still employed, for students who graduated in 2011. (Def.'s Add'l Facts Resp. ¶ 9.)

Wilson received a copy of the Plan, although he could not recall whether he read it during the time he was employed by CEC. (Pl.'s Add'l Facts, Ex. 1, Dep. of Riley Wilson at 40 - 41.) He testified that "it was just understood with – amongst the admissions representatives that [this] is how it works. . . . We [have] a threshold of students, a specific number of students we had to enroll for each start. And anything above and beyond that you'd receive $400 compensation for that student." (*Id*. at 39.) He understood that the student had to stay in school for a certain number of credits, and the admissions representative had to remain employed as of the time the student completed the number of credits. (*Id.* at 40.) CEC acknowledges that the employees enjoying the incentive bonuses viewed compensation from the Plan as an important element. (Pl.'s Add'l Facts, Ex. 2 at 70-71.) Over time there had been small changes in the Plan but no significant changes until its termination in 2011. (Def's Add'l Facts Resp. ¶ 6.) Changes in the incentive program had been discussed among some officers of CEC as early as February 2010, but no decisions had been made. (Pl.'s Add'l Facts, Ex. 4, Dep. of Maureen Cahill at 45-48; Ex. 15, Dep. of Jennifer Campe Ex. 12.)

In June 2010, the Department of Education published a Notice of Proposed Rulemaking that would disallow incentive compensation. (Pl.'s LR Resp. ¶ 25.) On June 17, 2010, then-president and CEO of CEC, Gary E. McCullough, sent a memorandum to all employees regarding the proposed changes. (*Id.* ¶¶ 5, 26.) A CEC vice-president testified that McCullough's message was intended to notify employees that there were changes coming and that CEC was determining how to react. (*See id.* ¶¶ 7, 27.) The memorandum said, among other things:

> Two potential changes that could affect our industry the most are in the areas of "gainful employment" and "incentive compensation." . . . CEC is also reviewing the "incentive compensation" and other rules proposed by the Department, whose goal is to finalize new rules by November 1 of this year so that they can go into effect in July 2011.

(Def.'s LR Stmt, Ex. 25 at 1.)

As CEC awaited the final changes to the Department of Education rules, the for-profit education sector was the subject of Senate hearings and media attention, which created a sense that companies like CEC were at risk. (Pl.'s LR Resp. ¶¶ 19-20.) Wilson was generally aware of the increased scrutiny of the industry because he "'kept [himself] in the loop as far as what other admissions people were hearing' and had seen negative media coverage 'referring to undercover students at the University of Phoenix and some similar online for-profit schools.'" (*Id.* ¶ 21.)

After the Department of Education published the proposed rules, CEC's executive leadership team engaged in collaborative discussions about the options for terminating the incentive plan, including timing and logistics of the process. (*Id.* ¶¶ 30-35.) When important decisions were to be made, the executive leadership team would discuss it, with McCullough making the ultimate decision. (*Id.* ¶ 11.) McCullough testified that he had the final decision making authority about issues relating to compensation, and that he made recommendations to CEC's board which was

responsible for approving or rejecting those recommendations. (Pl.'s Add'l Facts, Ex. 3, Dep. of Gary McCullough at 25-26.)

It is undisputed that throughout the summer and fall of 2010, there was no consensus among the CEC leadership team as to when the Plan should be terminated. (Pl.'s LR Resp. ¶ 45.) The members of the team testified that many factors were considered, including whether the Plan should be terminated as early as possible or let to run as long as possible or somewhere in the middle, what the Plan would be replaced with, what had to be added to the admissions representatives' salaries to replace the Plan compensation, the ability to execute the change in time to be compliant with the regulations, and the fact that some competitors had changed at different times. (*Id.* ¶¶ 30-35.)[3] One executive team member testified that McCullough "wanted to be conservative, he wanted to be compliant, [and] he wanted to be seen as a good company that offered value to our students, in terms of an educational experience and job placement." (*Id.* ¶ 29.)

CEC leaders met on August 27, 2010, to discuss strategies to end the ARSC Plan, concluding that their preference was to make all eligible payments through June 30, 2011. (*Id.* ¶ 36.)[4] Vice President Maureen Cahill's summary of the meeting reflects agreement that CEC would move to a "base pay only program effective 1/1/11 or earlier," and that "[a] one time adjustment would be made at time of transition based on a combination of tenure and historical ARSC results; then annually from that point forward." (Def.'s LR Stmt, Ex. 31.) She reported, "Key Assumption –

[3] CEC's competitors ended their incentive compensation programs at dates ranging from September 1, 2010 to April 1, 2011. (Pl.'s LR Resp. ¶ 67.)

[4] Attendees at that meeting included Chief Human Resources Officer Colon McLean, Senior Vice President and Chief Administration Officer Tom Budlong, Vice President of Total Rewards and HR Administration Maureen Cahill, and then-Director of Compensation Jackie Barry. (Pl.'s LR Resp. ¶¶ 6, 7, 36.)

CEC will reinvest $7.5 milion in ARSC funds (2010 projected total payouts) into base pay and/or tenure bonuses if allowed." (*Id.*) The 2010 budgeted Plan payouts were $7.5 million, but by September 2010 the projections for 2011 Plan payouts were up to $9 million. (Def.'s Add'l Facts Resp. ¶ 36.)

At a meeting on October 5, 2010, the leadership decided to "adopt a more conservative interpretation of the final regulations regarding incentive compensation and the elimination of the safe harbors [for bonus compensation to recruiters]; CEC does not want to be the test case for litigation related to admissions compensation." (Pl.'s LR Resp. ¶ 37.)[5] There was concern that stretching bonus compensation to July 1, 2011 would be seen by the Department of Education as "pushing the limits" and inviting Department scrutiny. (*Id.* ¶¶ 38-39.) There was support within the group for ending the ARSC plan as early as December 31, 2010, or as late as June 30, 2011. (*Id.* ¶¶ 37-45.)

Wilson focuses on the testimony by and about George Grayeb, a Senior Vice President of one of the Strategic Business Units, who advocated for the December 31, 2010 date. Grayeb recalled that he was the only one asking for that termination date. (Def's LR Stmt, Ex. 15, Dep. of George Grayeb at 37.) He had a target of saving "roughly, over a million dollars" for his business unit by early termination of the Plan. (*Id.* at 25-26.)[6]

---

[5] This meeting included Cahill, McLean, and Jackie Barry, in addition to Strategic Business Units Senior Vice Presidents George Grayeb and Brian Williams, and Vice President of Human Resources for the University Strategic Business Unit, Jen Campe. (Pl.'s LR Resp. ¶¶ 7, 9.) After October 2011, Campe became the Vice President of Human Resources Business Consulting, and then became Chief Human Resources Officer for CEC from July 2014 until November 2014. (*Id.* ¶ 7.)

[6] Grayeb left CEC in March 2011. (Def's LR Stmt, Ex. 15, Grayeb Dep at 6.)

Wilson also suggests that Chief Financial Officer Michael Graham advocated for early termination to save money (Pl.'s Resp. at 6), citing testimony by Cahill (*See* Pl.'s Add'l Facts ¶ 32). Cahill testified, however, that there were two "primary reasons" why Graham thought the Plan should be terminated earlier than Cahill herself advocated:

> One was financial. They saw, you know, a decline in enrollment very likely, and the financial impact of that; but, secondly, they were trying to respect this new legislation, and they were uncertain how, you know, payment beyond – you know further into the year, would that be perceived as, you know, a violation of the new regulations? It was so unknown.

(Cahill Dep. at 22-23.)

On October 29, 2010, the Department of Education published the final regulations to be effective July 1, 2011. (Pl.'s LR Resp. ¶ 46.) Those regulations officially removed the safe harbor provision relating to the incentive compensation for a person or entity involved with student recruitment or admission activity. (*Id.*) McCullough sent another employee update stating that the Departnment's new rule would require CEC to make changes to the compensation practices in order to remain in compliance. (*Id.* ¶ 47.)

The leadership team met again on November 17, 2010 to discuss "the ARSC Transition and Ongoing Compensation Program." (*Id.* ¶ 48.) At the time, some admissions representatives had a March 1 annual review date and some were reviewed on the anniversary of their hiring. (*Id.* ¶ 48.) There were discussions at the meeting about moving all admissions representatives to a common annual review date of either March 1 or June 1 for uniformity. (*Id.*) McCullough testified that using a March 1 date would align everyone in the company on the same bonus schedule. (*Id.* ¶ 58.) He further testified that he was unsure whether CEC would administratively be able to complete paying supplemental compensation before July 1, 2011, as the new regulations would require, if they waited

to implement the changes until the end of May. (*Id.* ¶ 59.)[7] Several replacements for the ARSC Plan were discussed at the November 17 meeting, including paying supplemental compensation to admissions representatives who were still employed with CEC when the new federal regulations went into effect, reinvesting some of ARSC Plan payments into employees' base salaries, and awarding retention bonuses and merit increases. (*Id.* ¶¶ 49-50.)

McCullough and the executive leadership team met again on December 3, 2010. (*Id.* ¶ 51.) Cahill circulated a document for that meeting entitled "Admissions Re-design Overview of New Model." (Pl.'s Add'l Facts, Ex. 28.) "Near Term Actions" were to include "Migrate the Advisors/Reps into the new model" and "Address the lost $$ opportunity for Advisors/Reps who have benefitted from ARSC payments over the past two years." *Id.* She made the following presentation to the group:

> ARSC Payouts will continue through 5/31/11 (last payment will be made 6/15/11); Pay increases for all Admissions Representatives/Advisors will be deferred until 6/1/11 (regularly scheduled 3/1 merit increases and those on anniversary review date schedule from 1/1 through 5/31) and prorated accordingly; using a 75% ARSC 're-investment' rate, all Admissions Represetatives/Adivsors will be slotted to a role and a point on the wage scale; and [a] one-time tenure-based retention bonus paid on 6/1/11 to any Admissions Representative/Advisor who is at CEC on date of announcement (@ 1/3/11) and active on date of payment[.]

(Pl.'s LR Resp. ¶ 51.) Cahill testified that the recommendation to end at May 31 rather than June 30 reflected the need to process payments before July 1, 2011. (*Id.* ¶ 53.) This recommendation differed from the executive leadership team's previous recommendation for terminating the ARSC Plan on June 30, 2011, and from Grayeb's preference for terminating the plan on December 31,

[7] Events confirmed his concern. Although CEC ultimately adopted February 28 as the last date for earning bonuses, it was still making the bonus payments in April because of the administrative process of "true ups" for those who recruited across campuses. (Pl.'s LR Resp. ¶ 78.)

2010. (*Id.* ¶¶ 40-41.) She presented estimates for admissions representatives' compensation showing that 2010 base salary plus ten months of actual 2010 Plan bonuses and two months of projected 2010 bonus payments would cost $93,683,793. (*Id.* ¶ 69.) The estimated cost for Cahill's suggestion of making bonus payments through May 31, plus adding a 4% merit increase to the admissions' representatives' salaries, and adding 75% of the admissions representatives' prior two year average of bonus payments, was $95,318,443. (Id. ¶ 70.)

McCullough testified that he "had to make a decision that would work for the company that would ensure that we remain compliant and that we can be conservative, so I wouldn't put – put the company at risk." (*Id.* ¶ 56.) McCullough further testified:

> I made a decision that I thought would be one that we could execute, that I thought would be in the best interests . . . of everyone concerned, and that ultimately would work with the corporate calendar that we had, with regard to giving pay raises and doing all those administrative functions that happened typically in the first quarter of the year. And so I made a decision to terminate it, I want to say, on February the 28th.

(*Id.* ¶ 57.) McCullough acknowledged that the solution was not perfect and some people would benefit and some people would be hurt. (Pl.'s Add'l Facts, Ex. 3, Dep. of Gary McCullough at 148-49.)

His decision to end the Plan on February 28 considered the fact that bonuses were paid to other employees of CEC in the month of March. Ending the Plan in February would allow CEC to pay admissions representatives bonuses at the same time as everyone else. (Pl.'s LR Resp. ¶ 58.) It would also allow CEC to give the admissions representatives their pay increases on March 1, in line with everyone else in the company. (*Id.*)

Cahill recalled that McCullough had the Human Resources people arguing to extend the date,

while the business leaders were feeling pressure related to cost. (Cahill Dep. at 106.) She felt that his decision to end the Plan on February 28 was "splitting the baby." (*Id.*)

On December 9, 2010, CEC announced to all admissions representatives that, as a result of the ED's revised regulations, CEC would discontinue the ARSC Plan, but CEC would continue to pay bonuses according to the Plan for compensation earned through February 28, 2011. (Pl.'s LR Resp. ¶ 63.) It is undisputed that, as a result of terminating the plan on February 28, 2011, no admissions representative's third quarter 2010 student enrollment would yield supplemental compensation. (Def.'s Add'l Facts Resp. ¶ 24.)

Wilson sent an email to a co-worker on December 9, 2010, stating: "Yeah I always thought they would get rid of suppy [supplemental compensation]. But it hurts that it had to come before my big payday." (Pl.'s LR Resp. ¶ 64.) Wilson explained this by saying that he expected the ARSC Plan would end, but did not know "if they got rid of it, how they would get rid of it and when it would happen, that kind of thing." (Def's LR Stmt, Ex. 2, Wilson Dep. at 109-10.) He testified:

> It was a big surprise for me. I guess part of me didn't want to believe the whispers that, you know, a large portion of my income was going to go away. But I think the whispers softened the blow a little bit, but still it was a little bit hard to swallow when it happened.

(*Id*. at 110.) 2010 had been his biggest start ever. (*Id*.) According to Wilson, in 2009, his recruiting threshold was 15 students and he recruited 23 students. (Answer to Compl. ¶ 13.) In 2010, his threshold was 13 students and he enrolled 41 students. (*Id.* ¶ 16.)

The details of the revised compensation plan were still not finalized as of February 10, 2011. (Def.'s Add'l Facts Resp. ¶ 38.) The decision ultimately reached was not simply to stop paying the incentive bonuses. Rather, CEC revamped the compensation program for all current admissions

representatives. (*Id.* ¶ 39.) Under the revised program, currently employed admissions representatives like Wilson received an adjusted salary based on current pay plus a 3% merit increase plus 75% of the average of their last two years of ARCS bonus payments. (Pl.'s LR Resp. ¶¶ 71-72.) Managers were also given the ability to do a "qualitative assessment" relative to pay. (*Id.* ¶ 74.) Unlike the previous bonuses, the increase in base pay would have the ripple effect of increasing other benefits like severance and vacation pay. (*Id.* ¶ 80.)

Wilson observes that the amount calculated for reinvestment did not include bonus amounts paid in the previous years to non-current employees, but he does not suggest why those amounts would be considered since an admissions representative had to be a current employee to receive a bonus. (*Id.* ¶ 72.) He also points out that the reinvestment amount did not extrapolate for admissions representatives with less than two years' tenure, but he does not suggest how many employees would be affected by that. (*Id.*) Wilson admits that CEC was not obligated to reinvest prior supplemental compensation into base pay. (*Id.* ¶ 73.)

Wilson states that, as a result of CEC's termination of the Plan bonuses as of February 28, he was not paid incentive bonuses for approximately 24 students he recruited who remained successfully enrolled for the time period required under the ARSC Plan. (Pl.'s Add'l Facts, Ex. 31, Decl. Riley Wilson ¶ 11.) He states that, as a result, he did not receive more than $9,000 in bonus payments to which he was entitled. (*Id.* ¶ 12.) It is not clear from the record where those numbers come from. Wilson's Statement of Additional Facts cites only his declaration and his deposition transcript in which he refers to the allegations in his complaint. (*See* Pl.'s Add'l Facts ¶ 40.) CEC admits that Wilson did not receive $9,200 for students who started in the third quarter but does not admit that was what he would have earned. (*See* Def.'s Add'l Facts Resp. ¶ 40.) The parties agree,

however, that under the revised compensation program, Wilson received a 6% increase in his base salary – a $2,447.83 raise added to his $39,360.17 annual salary. (*Id.*)

For CEC, the revised compensation program resulted in an increase in the cost of admissions representatives' compensation, although the parties dispute how much of an increase. As noted above, the projected total for admissions representatives' base salary, ten months of ARSC Plan payments, and two months of projected ARSC Plan payments was more than $93.6 million. CEC states that the actual total compensation to admissions representatives for 2011, including $1.27 million in bonus payments, was $96.7 million. (Def.'s LR Stmt, Ex. 5, Decl. Jennifer Campe ¶ 12.) Wilson cites Campe's deposition testimony that the total compensation was $95.8 million (Pl.'s LR Resp. ¶ 79), and argues that the $1.27 million in bonus payments should be charged back to 2010, resulting in total compensation cost in 2011 of $94.5 million. (Pl.'s Resp. at 14.) That cost does not include the effect of increased salaries on other benefits like severance and vacation pay. (Pl.'s LR Resp. ¶ 80.)

Chief Human Resources Officer Colon McLean recalled that Grayeb argued to end the Plan early for cost reduction, but ultimately cost reduction was not part of the proposal because CEC used a financial model that took what had been spent on bonuses in the past and reinvested it in base salaries in the future. (Def.'s Add'l Facts Resp., Ex. 50, Dep. of Colon McLean at 70-71.) "[T]he cost of the admissions advisors was flat year over year as a result of that." (*Id.* at 71.)

## LEGAL STANDARD

Summary judgment on all or part of a claim or defense is proper "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To oppose a motion for summary judgment successfully, the responding party may not simply rest on its pleadings, but rather must submit evidentiary materials showing that a material fact is genuinely disputed. Fed. R. Civ. P. 56(c). A genuine dispute of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the responsibility of identifying applicable evidence. *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996). In determining whether a genuine dispute of material fact exists, the court construes all facts and draws all reasonable and justifiable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255.

As a threshold matter, CEC argues that the court should disregard Wilson's responses to CEC's statements of fact because Wilson responded with improper argument and additional, unresponsive facts. (Def.'s Reply at 4.) Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." That rule also requires that an opposing party respond to each paragraph in the moving party's statement, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. L.R. 56(b)(3)(B). The rule has been interpreted to allow a court to disregard statements in responses that go beyond what is necessary to justify a denial, including additional legal conclusions and arguments. *Ross v. RJM Acquisitions Funding, LLC*, 2006 WL 752953 at *1 n.2 (N.D. Ill. Mar. 16, 2006), *aff'd*, 480 F.3d 493 (7th Cir. 2007); *Gross v. Radioshack Corp.*, 2007 WL 917387 at *14 n. 20 (N.D. Ill. Mar. 26, 2007).

CEC observes that in several responses Wilson either first admits or does not dispute the statement, but then adds argument and facts. (Def.'s Reply at 4.) After reviewing the challenged responses, the court concludes that they will not be disregarded. The responses that CEC lists dispute each statement. The responses then cite to the record to clarify why the dispute was made and to what extent the statement was disputed, including disputing possible inferences that could be made from CEC's statement. While portions of Wilson's responses would have perhaps been more properly placed in his own statement of additional facts, they were responsive to CEC's statements and cited affidavits, the record, and other supporting materials to clarify Wilson's disagreement. To the extent that Wilson added argument rather than factual support for his dispute, the court has disregarded the argument. Wilson's responses here are not as egregious as the Local Rule 56.1 response discussed in *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008), cited by CEC.

**DISCUSSION**

The question is whether, construing all facts and all reasonable and justifiable inferences in favor of Wilson, there is sufficient evidence favoring Wilson that a reasonable jury could return a verdict in his favor on his claim that, in deciding to limit bonus payments to those earned as of February 28, 2011, CEC exercised its discretion to terminate the Plan in violation of its obligation of good faith and fair dealing. The court concludes that a reasonable jury could not, and, therefore, CEC is entitled to summary judgment.

"The Illinois courts have stated that every contract implies good faith and fair dealing between the parties to it." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir.

1992).[8] When the contractual obligation of one party is contingent upon a condition peculiarly within the power of that party, the implied covenant of good faith and fair dealing "limits the controlling party's discretion and the controlling party must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id*. (internal citation omitted). While "the element of good faith dealing implied in a contract is not an enforceable legal duty to be nice or to behave decently in a general way. . . . [a]vowedly opportunistic conduct has been treated differently." *Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987) (internal quotation omitted).

In the Seventh Circuit's decision in this case, the two opinions that agreed to remand differ somewhat in expressing how the obligation applies here. Judge Darrow stated that it would be unreasonable for Wilson to expect that CEC would only terminate the ARSC Plan for good cause because the express terms of the Plan precluded such an expectation. But it was reasonable for Wilson to expect that avoiding the conditions required for Wilson to earn a bonus on a recruited student would not be "the but-for reason" for CEC exercising its discretion to terminate the bonus payments as of February 28, 2011. *Wilson*, 729 F.3d at 675-76 (citing *Martindell v. Lake Shore Nat'l Bank,* 154 N.E.2d 683, 691(Ill. 1958) (defendant acted in bad faith under the terms of the contract to avoid the plaintiff's option rights); *LaScola v. U.S. Sprint Commc'ns*, 946 F.2d 559, 566 (7th Cir. 1991) (recognizing that an employer cannot exercise its discretion in bad faith to fire an at-will employee so to deprive that employee of commissions)).

---

[8] Although the parties initially disputed whether Illinois or Minnesota law applies to Wilson's claim, the Seventh Circuit previously determined that there is no substantive difference between the laws of Minnesota and Illinois regarding contracts and the implied covenant of good faith and fair dealing, and analyzed the issue under the laws of the forum state, Illinois. *Wilson*, 729 F.3d at 673.

Judge Hamilton's opinion reflects his concern, based on the pleadings in Wilson's complaint, that CEC terminated bonuses as of February 28 in an "opportunistic grab to keep the pipeline bonuses." *Wilson*, 729 F.3d at 680 (Hamilton, J., concurring). The Plan, he observed, did not discuss the possibility that "the employer would simply decide one day to keep all the employees' pipeline bonuses for itself." *Id*. at 678. He referred to "[t]he transparent unfairness of CEC's cancellation of the pipeline bonuses," based on the inference from the complaint that CEC induced the admissions representatives to work harder and "then decided to keep for itself as much of that benefit as it thought it could get away with." *Id*. at 679. By changing as of February 28, "Wilson alleges, CEC simply kept for itself more than $5 million it should have paid to its admissions representatives. That looks like the 'avowedly opportunistic conduct' that we recognized as actionable in *Jordan v. Duff and Phelps, Inc*." *Id.* at 681 (citation omitted.) He was concerned that CEC's reliance on the regulations was "a pretext for simple greed at the expense of the admissions representatives who contributed to its success." *Id.* In evaluating the reasonable expectations of the parties, "[t]he relevant expectations are those based on the objective indications of CEC's promises and behavior, including CEC's past course of dealing with Plan amendments." (*Id.* at 682.)

> The critical issue on remand is whether CEC acted in bad faith in deciding to terminate the Plan earlier than required so as to seize for itself the pipeline bonuses that Wilson and other admissions representatives were reasonably expecting to be paid as students completed their studies. . . . *[T]he decision on the bad faith claim should focus on CEC's motives, applicable to all, and not on circumstances unique to each employee.*

*Id.* (emphasis added).

The Plan and its bonus payments had to end no later than June 30, 2011. The "whispers,"

as Wilson phrased it, that bonus payments were coming to the end were in the wind as early as June 2010. Those whispers were reinforced by a message from the CEO McCullough to all employees on June 17, 2010, informing them that the Department of Education had issued a Notice of Proposed Rulemaking regarding incentive compensation (among other things), and that CEC was reviewing those rules. That message was sent at the beginning of the third quarter, while Wilson was undertaking his recruiting efforts. Wilson admitted that he thought the Plan would be discontinued; he just did not know when or how.

CEC's leadership team initially had a range of viewpoints in deciding how to proceed in light of the anticipated rule prohibiting bonus payments. Wilson emphasizes the fact that some members of the team, including Grayeb, argued for a termination date as early as December 2010, based on hoped-for cost savings that would benefit the business units. That view, however, did not prevail. From the meeting in August 2010, the "Key Assumption" was that CEC would "reinvest" the $7.5 million (the amount of the then-anticipated bonus payments) back into the admissions representatives' base pay or tenure payment.

Wilson argues that "cost savings was the primary driver in terminating the Plan in February 2011." (Pl.'s Resp. at 12.) The facts do not support that argument. In deciding when to end the bonuses, McCullough had business unit executives like Grayeb arguing for an earlier date and Human Resources executives arguing for a later date. Going until June 30 was unrealistic because the administrative work could not be completed in time to get the payments made before the cut-off date set by the Department of Education. McCullough made the decision to end on February 28, he testified, because it would bring all of the admissions representatives to the same review and bonus time as everyone else in the company (March 1). It would also provide sufficient time to finish all

administrative work to make bonus payments before the ED deadline. Further, it was in line with the termination dates of incentive programs set by CEC's competitors. Those facts are undisputed.

March 1, 2011 was not just the end of the bonuses; it was the beginning of the revised compensation program. Under that program, every currently-employed admissions representative got a raise in base salary of at least the total of 3% plus 75% of his or her previous two years' bonuses. As Wilson points out, some admissions representatives did better under the revised program than they would have under the Plan. (Pl.'s Resp. at 15.) His corollary argument – that "high performing Admissions Representatives" like himself "bore the financial brunt" (*id.*) – is not necessarily so. Wilson personally faired less well under this calculus because his one exceptionally good year was 2010-11. Other representatives who had consistently high previous years (on which the 75% salary increase was based) could have done just as well if not better under the revised program.

Moreover, whether any one among the 2,123 admissions representatives did better or worse is not the ultimate question on the issue of whether CEC acted in bad faith. "[T]he decision on the bad faith claim should focus on CEC's motives, applicable to all, and not on circumstances unique to each employee." *Wilson*, 729 F.3d at 682 (Hamilton, J., concurring).

The most important fact is that there is no evidence that CEC retained for itself $5 million in bonus payments that were due to admissions representatives, as Wilson alleged. Although Wilson argues that cost savings was the primary driver of the decision to end the Plan as of February 28, Wilson admits there was no cost savings to CEC. The result, he acknowledges, left "macro-costs stagnant." (Pl.'s Resp. at 15.)

Under the law of the case here, CEC had a contract right to terminate the Plan at any time,

but had an implied obligation not to do so in bad faith for the purpose of keeping for itself the bonuses for students who were "in the pipeline." The evidence shows that cost saving was not the "but-for" of the decision to terminate the Plan bonuses on February 28, 2011. No reasonable jury could conclude that CEC chose February 28 as the date to end the Plan bonuses for the purpose of keeping the admissions representatives' bonuses for itself. Accordingly, CEC's motion for summary judgment is granted.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment [dkt 79] is granted. Judgment is entered for defendant Career Education Corporation and against plaintiff Riley Wilson.

IT IS SO ORDERED.

Geraldine Soat Brown
United States Magistrate Judge

Dated: December 18, 2015